UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                       :

  ZINNAT RAHMAN,                         :

                                      :

                         Plaintiff,     :     **MEMORANDUM DECISION AND**

                                     :     **ORDER**

        - against -            :

                                       :     22-cv-3309 (BMC)

  MARTHA CARLIN, DAVID CLOSE,   :

  DANIEL RAGONE, and GERARD    :

  DECUSATIS,                     :

                                       :

                        Defendants.    :
-------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff alleges that defendants retaliated against her after she filed a complaint with the

New York State Department of Human Rights ("NYSDHR") alleging race/color and national

origin discrimination.[1]  Before the Court is defendants' motion for summary judgment on

plaintiff's retaliation claims under 42 U.S.C. § 1983 and the New York State Human Rights Law

("NYSHRL"), her only remaining claims following the July 7, 2023 so-ordered stipulation of

partial dismissal.  For the reasons set forth below, defendants' motion is granted.

## BACKGROUND

      In 2008, plaintiff began working for the New York State Office of Mental Health

("OMH") in its New York City Field Office as an Assisted Outpatient Treatment ("AOT")

Compliance Specialist.  In 2011, she became a non-competitive AOT Compliance Specialist 1 at

the Long Island Field Office ("LIFO").  AOT positions, like plaintiff's, relate to "Kendra's

Law," a statutory framework for court-ordered AOT to ensure that individuals with mental

---

[1] Plaintiff's complaint also alleges disability discrimination, though neither party mentions it.

illness and a history of hospitalizations or violence participate in community-based services appropriate to their needs.  Plaintiff's role at LIFO was to oversee the AOT program on Long Island and ensure that individuals who had an AOT designation were receiving their court-ordered treatment services.

In April 2018, two weeks after returning to work following six months of leave for a back injury, plaintiff met with defendant Martha Carlin, the Director of LIFO, and defendant David Close, plaintiff's direct supervisor and the Deputy Director of LIFO, to discuss her job responsibilities and workload.  Carlin and Close noted that plaintiff had not entered any AOT orders in the tracking database since she had returned from leave.[2]  Although plaintiff indicated that she needed assistance with her caseload due to ongoing back pain, Carlin and Close expressed that LIFO had limited resources and could not permanently assign a staff member to assist plaintiff.  Carlin's notes from the meeting indicate that Carlin and Close offered alternative support, including a second computer monitor, the option to attend quarterly AOT meetings in Albany via videoconference, and clerical assistance for filing.  Carlin's notes also indicate that plaintiff "presented with a hostile attitude, was dismissive in her responses and frequently smirked in response to any response given to her by her supervisors."  Plaintiff left work after the meeting, saying she was using four hours of sick leave.  This prompted a conference call among

---

[2] Plaintiff attempts to refute this fact from defendants' Rule 56.1 statement with a citation to her declaration, in which she states that she "do[es] not recall the issue being discussed with Carlin and Close."  Plaintiff's mere inability to recall an event does not create a factual dispute as to whether that event occurred.  See Johnson v. City of New York, 18-cv-6256, 2020 WL 2732068, at *4 (S.D.N.Y. May 26, 2020) (collecting cases).  The Court thus deems defendants' statement admitted.  Moving forward, the Court will not flag every instance in which plaintiff responds to defendants' 56.1 statement with "I don't remember" – there are too many such instances for this to be practicable. The Court will simply deem those statements admitted.

Carlin, Close, and defendant Daniel Ragone, Assistant Director for the Bureau of Central Office Personnel Services.[3]

The day after her meeting with Carlin and Close, plaintiff went on leave again and did not return to work until December 20, 2018, nearly eight months later.  Carlin and Close met with plaintiff upon her return to discuss her desired work schedule, go over staffing changes, discuss her AOT tasks, discuss the allocation of duties between her and Lucianne Stalzer (who was appointed as an AOT Compliance Specialist 1 to handle plaintiff's duties while she was on leave), and review the time and attendance policy and procedures.

A few days after plaintiff returned to work, Close sent out an email announcing that plaintiff was LIFO's Suffolk County AOT Coordinator and Stalzer was LIFO's Nassau County AOT Coordinator.  Anne Marie Csorny, an AOT Suffolk Coordinator, responded to Close's email to say that she was "very unhappy" about plaintiff's appointment as Suffolk County AOT Coordinator.  Csorny explained that plaintiff had "demonstrated no real understanding or interest in the AOT clients" and noted that plaintiff often demanded Csorny's staff to provide information that was already provided or available pursuant to the established process.[4]

---

[3] In plaintiff's response to defendants' Rule 56.1 statement, she states that she "does not have any recollection of this event of her using four hours sick leave" (which, again, is not a proper denial) and "does not have any knowledge of the [d]efendants' communications."  "'Parties are ... prohibited from attempting to raise a material issue of fact by denying statements which the moving party contends are undisputed for lack of knowledge and information because discovery allows the party opposing summary judgment to obtain the facts necessary to determine whether it must admit or deny them.'"  Bellis v. New York City Dep't of Educ., No. 21-cv-3282, 2024 WL 1177232, at *2 (S.D.N.Y. March 19, 2024) (quoting Stepheny v. Brooklyn Hebrew Sch. for Special Child., 356 F. Supp. 2d 248, 255 n.4 (E.D.N.Y. 2005)).  The Court thus deems defendants' statement admitted.  Moving forward, the Court will not flag every instance in which plaintiff responds to defendants' 56.1 statement with "I don't know" – as was the case with "I don't remember," there are too many such instances for this to be practicable.  The Court will simply deem those statements admitted.

[4] In plaintiff's response to defendants' Rule 56.1 statement and in her opposition memorandum, she argues that the Court should disregard Csorny's email because defendants did not identify Csorny as a witness in their initial disclosures and because the email is "rank hearsay."  The former argument has no support in the Federal Rules of Evidence.  The latter argument is misplaced because the email serves a non-hearsay purpose: it shows that Close was notified of perceived issues with plaintiff's performance and behavior in December 2018, before plaintiff filed her NYSDHR complaint.

According to Csorny, her staff's "past experiences with [plaintiff] ha[d] been horrible." Copying Carlin in his response, Close thanked Csorny for noting her concerns, said they were open to understanding and addressing any concerns related to plaintiff's approach to her job duties, and asked to be notified if plaintiff exhibited any concerning behaviors that might compromise patient care.

On April 12, 2019, plaintiff was scheduled to be "on call." Every staff member except the leadership team was required to be on call on a rotating basis, during which time they would help manage and document incoming calls from the community. That day, a Friday, Maryann Braithwaite, Associate Director for Children and Youth Services, copied plaintiff in her email response to a community request and indicated that plaintiff was handling the request. (Braithwaite apparently forwarded the request to plaintiff separately, but neither party has offered that email.) Plaintiff did not reply, so Braithwaite emailed her on the following Monday to ask whether plaintiff followed up with the request. The next day, plaintiff responded that she was "a little confused about what kind of assistance" Braithwaite needed. Braithwaite and plaintiff then argued over which of them was responsible for the request. Plaintiff still declined to handle the request, so Braithwaite copied Close on the email correspondence. Close told plaintiff, "[S]ince you were on call last Friday when the request was made it is your responsibility to follow up as per Maryann's request."

The next day, Close and Carlin attempted to meet with plaintiff to discuss what happened between her and Braithwaite (the "on-call incident"). An email from Carlin to Ragone, copying Close, outlined concerns to be addressed with plaintiff, including lack of familiarity with the on-call policy, knowledge deficit, not checking emails, disrespecting a supervisor, and responsiveness of the field office. Plaintiff declined to meet with her supervisors without her

4

union representative present. She then left the office because noise from ongoing construction nearby was causing her ear pain and a headache.[5] She eventually met with Carlin, Close, Ragone, and Braithwaite on April 24, 2019 to discuss the on-call incident, at which they discussed the importance of quickly responding to concerns from the community and requests from the field while on call.

On April 29, 2019, plaintiff filed charges of race/color and national origin discrimination with NYSDHR and EEOC for claims for failure to promote and unequal pay. Presumably, this complaint was prompted by a discussion plaintiff had with Ragone and an HR representative in which plaintiff discussed her desire to be promoted.[6] On May 22, 2019, the Governor's Office of Employee Relations ("GOER") issued a draft investigation report finding that all of plaintiff's allegations were unsubstantiated.

Close and Erin Rostron, Director of Licensing, met with plaintiff in June and July 2019 to review LIFO's sick-call policy. By defendants' count, plaintiff called out sick without following LIFO's unscheduled leave protocol on at least seven occasions since she returned from leave in December 2018.

On August 20, 2019, Close and Rostron had a meeting with plaintiff at which Close issued plaintiff an overall satisfactory annual evaluation for the preceding year. Plaintiff had

---

[5] Plaintiff requested and received a reasonable accommodation to be relocated to a different building until construction was complete. She returned to her office at LIFO on July 1, 2019 when the construction ended.

[6] In response to defendants' 56.1 statement, plaintiff says she "does not recall this alleged event." This, of course, is not a proper denial. Additionally, plaintiff's statements in her NYSDHR complaint strongly suggest that she made the complaint in response to the very conversation that she "does not recall." In the NYSDHR complaint, she wrote that "the most recent or continuing discrimination took place [on] 4/24/2019." This is the date that defendants say plaintiff met with Ragone and an HR representative to discuss a promotion, and plaintiff has not indicated that anything else happened on that date. Moreover, plaintiff's lack of a promotion is exactly what the NYSDHR complaint is about. The Court does not understand what plaintiff hopes to gain from this ineffective attempt to raise a dispute.

been on leave for most of the rating period.  Close did, however, give plaintiff a "needs improvement" notation relating to the on-call incident.

On September 17, 2019, plaintiff emailed Close requesting to opt of the upcoming staff retreat (which had been set for a month), saying, "The reason remains the same as I have mentioned verbally and that is, I don't feel like going."  Carlin emailed plaintiff to explain that the retreat was a team building opportunity and that the expectation was that she be present. Carlin told plaintiff that if she was averse to attending, she would need to request time off and charge appropriate accruals.  Plaintiff responded that she could not attend because she had chronic pain from her back injury and required an ergonomic chair and time to lay down, and also needed a private place to pray five times day.  Carlin responded that she "agree[d] that it could be challenging to meet all of the accommodations [plaintiff] need[ed] in an off-site location," and thus told her that she could stay at the office and that they would do their best to include her in as many activities as possible through conference calls.  She asked plaintiff to let her know if she had any concerns or suggestions as to how they could best include her.  Plaintiff did not respond to Carlin's email but claims that she never received a call from Carlin on the day of the retreat.

On September 18, 2019, plaintiff filed a non-contract grievance against Close and Rostron, complaining that Rostron's presence at the August 20, 2019 meeting was a breach of confidentiality.  Ragone later denied this grievance.

On September 19, 2019, Carlin emailed Ragone and an HR representative to notify them of various difficulties and performance issues she had experienced with plaintiff since she returned from leave in December 2018.  She opened the email with, "We have a disturbing pattern that is beginning to emerge with [plaintiff] ... and it is presenting some unique challenges

in management.  If we assign a work task to [plaintiff] that she doesn't want to complete, she

responds with retribution against her supervisors."  After detailing some examples of this

behavior, Carlin concluded her email with the following:

> I have also noted a pattern within myself.  When there is a work task that should be assigned to her, I often handle it myself without assigning it to [plaintiff] because I don't want the 'push back' and because I don't have confidence that she will complete the task in a conscientious way.  Previous supervisors have not held her accountable out of fear that she will make an allegation or complaint and this is the reason that she has received satisfactory performance evaluations.  We had requested that our licensing director, Erin Rostron, be present at certain meetings with [plaintiff's] supervisor because there is currently a formal complaint against her supervisor and myself, and we were advised not to meet with her alone.  We have only four supervisors in this office.  [Plaintiff] now has a complaint/grievance against three out of four.  I'm open to suggestions and recommendations here because **the situation is becoming untenable**."

(Emphasis added).

On October 2, 2019, when asked to handle an on-call concern the following day, plaintiff

responded that she would be out of the office until 1:00 PM and that since she had been out for

the last two days, she had too much to catch up on to take any on-call requests.  After Carlin

explained to plaintiff that staffing was limited that day, plaintiff agreed to help cover on-call

requests from 1 to 4 PM.  Carlin offered to cover 4 to 5 PM if necessary.

On October 31, 2019, NYSDHR issued its final determination in response to plaintiff's

April 29, 2019 complaint, finding that that there was no probable cause to believe that

discrimination occurred.

On November 13, 2019, plaintiff emailed Ragone to inform him that Carlin took two

photographs of her at a staff meeting without her knowledge or consent, which was "intimidating

and discriminatory," and "a form of retaliation for the grievance [she] ha[d] filed."  She also

mentioned that Close had previously asked her whether she had security cameras at her home.

Claiming that she feared for her family's safety, she requested that GOER formally interrogate

Carlin.  Ragone responded to her the next day and asked her a series of follow-up questions "[s]o

that these incidents [could] be properly investigated."  Ragone followed up again the next day, having not received a reply from plaintiff to his last email.  A few hours later, Ragone called plaintiff to discuss.  The parties characterize the conversation between plaintiff and Ragone very differently, but at least agree that Ragone called plaintiff to investigate her complaints against Carlin and Close, that plaintiff refused to answer questions, that Ragone told her that her failure to respond would constitute insubordination, and that plaintiff hung up.

On November 22, 2019, Amy Rodak, then Director of the Central Office Personnel Services, sent plaintiff a letter scheduling an interrogation regarding possible discipline pursuant to Article 33 of the Public Employees Federation Collective Bargaining Agreement ("PEF Contract").  Although the letter did not reveal the subject of the interrogation, the parties agree that it was in connection with plaintiff's failure to give sufficient information to the Office of Personnel to investigate her claims against Carlin and Close.  The interrogation was initially scheduled for December but was then pushed to January. In the meantime, Ragone questioned Carlin and Close regarding plaintiff's claims pursuant to Section 33.3(b) of the PEF Contract; both denied plaintiff's allegations.

On November 25, 2019, Carlin emailed Close a pages-long summary of plaintiff's work performance issues since December 2018.  The document catalogued time and attendance issues, interpersonal incidents, resistance to work policies, non-responsiveness while in the field, and problems documenting and responding to complaints from patients and the public.  On the last issue, Carlin's email indicated that plaintiff did not respond to complaints in a timely or comprehensive way, and that plaintiff's performance was an outlier for the office.  By contrast,

plaintiff maintains that the complaint system was not working properly for her, and that there is no evidence suggesting that she had worse issues than other employees.[7]

Plaintiff filed an NYS Discrimination Complaint with GOER on January 1, 2020, stating that she complained about discrimination on November 13 (her claims about Carlin and Close) but that management was not investigating her complaint and was harassing her in response. GOER later informed her that her complaint did not fall within the purview of their Anti-Discrimination Investigations Division.

Defendant Gerard DeCusatis, Assistant Director of Employee Relations, first interrogated plaintiff on January 9, 2020. Plaintiff had two union representatives present. Although the parties agree that plaintiff was interrogated regarding her refusal to provide the information necessary to investigate her claims against Carlin and Close, the interrogation covered several other topics, such as the call-in sick policy, the on-call policy, and plaintiff's performance evaluations.[8] DeCusatis threatened plaintiff with insubordination multiple times throughout the interrogation when plaintiff refused to answer questions (generally at the direction of her union representatives). Notwithstanding DeCusatis's threats, plaintiff refused to reveal which employee had told her that Carlin had taken photos of her.

Plaintiff met with Close and Rostron on February 25, 2020 to discuss her six-month evaluation issued by Close and Carlin, which was overall unsatisfactory. Close informed

---

[7] Exhibit U, a list of community complaints assigned to plaintiff, is not Bates-stamped. Defendants are not entitled to rely on documents which they have not produced to plaintiff. It also appears that defendants may have drafted this document for the purpose of litigation, which would make it inadmissible.

[8] In response to defendants' 56.1 Statement, plaintiff admitted that she was interrogated regarding her claims against Carlin and Close and directed the Court to the "attached complete transcripts of the two interrogations." Plaintiff seems to have confused the Court's role with her own, as it was her responsibility to pull material facts from the record evidence. Counsel would do well to remember that "judges are not like pigs, hunting for truffles buried in the record." Kane v. DeBlasio, 19 F.4th 152, 167 n.15 (2d Cir. 2021) (quoting United States v. Morton, 993 F.3d 198, 204 n.10 (3d Cir. 2021)).

plaintiff that if her performance did not improve, she would most likely receive an unsatisfactory evaluation for the year. The next day, Carlin emailed Ragone, DeCusatis, Close, and others documents relating to plaintiff's six-month evaluation and stated: "Given [plaintiff's] poor response to yesterday's meeting, I would support scheduling another interrogation meeting. However, given that she accused David [Close] of 'retaliation,' if another interrogation is scheduled, I hope that it can be scheduled quickly before [plaintiff] file[s] another grievance and/or complaint."

DeCusatis interrogated plaintiff a second time on March 9, 2020. DeCusatis questioned plaintiff concerning the staff retreat, her use of the complaint software, and her complaints against Carlin and Close, among other topics. Plaintiff again refused to identify who told her that Carlin took photos of her. Following the interrogation, Rodak immediately placed plaintiff on administrative leave with full pay. During plaintiff's leave, DeCusatis completed his investigation into her complaint against Carlin and Close, and determined that none of the staff members he interviewed had observed Carlin taking photos of plaintiff.

Plaintiff returned from leave in July 2020 and, on August 5, 2020, received a Notice of Discipline from Rodak. The Notice of Discipline charged plaintiff with the following: 1) insubordination for responding "I don't feel like going" when asked to attend an office retreat; 2) inappropriate behavior during a November 4, 2019 meeting; 3) between August 26, 2019 and January 10, 2020, responding inappropriately to 11 of 19 of the complaints she was assigned; and 4) on March 9, 2020, refusing to answer questions during an interrogation relating to identifying the employee who told her that Carlin was taking photos of her. The Notice of Discipline sought eight weeks of suspension without pay.

On August 31, 2020, Carlin and Close issued plaintiff an unsatisfactory evaluation for the preceding year.  Plaintiff appealed her unsatisfactory evaluation to the Agency Appeals Board, which denied her appeal.  She then appealed her evaluation to the Statewide Performance Evaluation Appeals Board, which also denied her appeal.

Apparently nothing of note happened for nearly a year.  But on August 6, 2021, plaintiff filed a second complaint with NYSDHR claiming discrimination and retaliation by Carlin, Close, Ragone, DeCusatis, Rodak, and an HR representative for filing a Notice of Discipline against her and giving her an unsatisfactory performance evaluation after she filed her April 29, 2019 charge of discrimination.  Just weeks after plaintiff filed this complaint, she received an overall satisfactory evaluation for the preceding year, which noted that she improved in all categories and had an increased willingness to work with colleagues and supervisors in a productive and civil manner.

On January 11, 2022, Close, on behalf of himself and Carlin, emailed DeCusatis to propose that OMH withdraw plaintiff's Notice of Discipline because she had significantly improved her performance, and because moving forward with the Notice of Discipline arbitration would "likely disrupt the current positive, collaborative interpersonal work dynamics that ha[d] developed."  The Notice of Discipline was never acted upon but, to plaintiff's knowledge, is still in plaintiff's personal history file.

On February 19, 2022, the Office of Personnel received a determination from NYSDHR regarding plaintiff's August 6, 2021 complaint, which found "no probable cause to believe [they] ha[d] engaged in or [were] engaging in the unlawful discriminatory practice complained of" and no retaliation.  NYSDHR therefore dismissed plaintiff's complaint.

Plaintiff took a leave of absence around April or May 2022 after her request for a reasonable accommodation of disability to work full-time at home was denied. Plaintiff did not return to work when her Worker's Compensation and FMLA leave were exhausted, and was thus terminated on July 6, 2022.

## DISCUSSION

### I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

A party may not defeat a motion for summary judgment solely through "unsupported assertions" or conjecture. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "'[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita, 475 U.S. at 586-87); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994). Indeed, the non-moving party

12

must offer "concrete evidence from which a reasonable juror could return a verdict in [her] favor." Anderson, 477 U.S. at 256.

## II.    Res Judicata

Defendants argue that plaintiff's § 1983 claim is barred by the doctrine of *res judicata* based on NYSDHR's investigation and "no probable cause" determination in connection with plaintiff's August 6, 2021 NYSDHR complaint. Although the instant case may involve similar, perhaps identical issues to the NYSHDR proceedings, the absence of several hallmarks of federal litigation makes clear that plaintiff did not have a full and fair opportunity to litigate her claims before NYSDHR. As a result, *res judicata* does not bar plaintiff's § 1983 action.

"[I]n § 1983 actions, the factual determinations of a state administrative agency, acting in a judicial capacity, are entitled to the same issue and claim preclusive effect in federal court that the agency's determinations would receive in the State's courts." Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 728 (2d Cir. 2001) (citing Univ. of Tenn. v. Elliott, 478 U.S. 788, 798-99 (1986)). Therefore, this Court must apply New York law governing *res judicata*. See id. at 730 n.7. Under New York law, defendants, the proponents of *res judicata*, must prove an "identity of issue which has necessarily been decided in the prior action and is decisive of the present action," and plaintiff, the opponent, must prove that she did not have a "full and fair opportunity to litigate the issue." See id. at 730 (internal quotation marks omitted) (citing Schwartz v. Public Adm'r, 246 N.E.2d 725, 729 (1969)).

Because plaintiff appears to concede an "identity of issue," the Court evaluates only whether plaintiff had a full and fair opportunity to litigate the issue. To that end, the Court must consider "the various elements which make up the realities of litigation," and whether those were present in the NYSDHR proceedings. See id. at 734.

Plaintiff argues she did not have a full and fair opportunity to litigate the issue before the NYSDHR because there was no hearing, no sworn testimony, no discovery, and no opportunity to cross-examine or subpoena material witnesses, and because she was acting *pro se*. There is a question as to whether plaintiff was not afforded a full opportunity to litigate her case or simply failed to avail herself significantly of that opportunity. But absent any decisive evidence or argumentation on this point, the Court is not going to decide that issue. Moreover, since plaintiff was acting *pro se*, she may not have known how to properly avail herself of the administrative forum. At a minimum, she "could not have been expected or able to frame her evidence within the context of the specific legal issues," and would not "necessarily have known what facts were most relevant or persuasive in proving her case." See id. at 736. She also may not have appreciated the possibility "that the determinations made by the [NYS]DHR would prevent her from litigating the same issues in federal court." See id. at 735.

Therefore, because plaintiff was *pro se*, and because her NYSDHR proceedings lacked several important (though not individually dispositive) elements present in federal litigation, plaintiff's NYSDHR proceedings do not preclude her current § 1983 action.

## III.    Merits

"[A] state employee may bring a retaliation claim under § 1983 against a supervisor who, acting under color of law, retaliates against [her] for opposing discrimination in the terms of [her] employment." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 82 (2d Cir. 2015). The NYSHRL similarly permits such claims. See N.Y. Exec. Law § 296. Both § 1983 and NYSHRL retaliation claims are analyzed pursuant to Title VII principles and are thus evaluated under the three-step burden-shifting analysis from McDonnell Douglas Corp. v. Green, 411 U.S. 792 802-05 (1973). Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010).

14

First, the plaintiff must establish a *prima facie* case of retaliation.  Id.  Under § 1983, the plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) a[ ] [materially] adverse employment action; and (4) a causal connection between the protected activity and the [materially] adverse employment action."  Id. at 164-65 (internal quotation marks and citations omitted).  By contrast, under the NYSHRL, the plaintiff "must demonstrate that she took an action opposing her employer's discrimination and that, as a result the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  Edelman v. NYU Langone Health Sys., 141 F.4th 28, 45 (2d Cir. 2025) (internal quotation marks and citation omitted).  For either cause of action, the plaintiff's burden at this stage is *de minimis*.  Hicks, 593 F.3d at 164.

If the plaintiff meets her initial burden, a presumption of retaliation arises and the defendant must, at the second step, "articulate a legitimate, non-retaliatory reason for the adverse employment action."  Id. (internal quotation marks and citation omitted).  "If so, the presumption of retaliation dissipates," and the plaintiff must, at the third step, "show that retaliation was a substantial reason for the adverse employment action."  Id. (internal quotation marks and citation omitted).  Under § 1983, the plaintiff can meet this burden "by proving that a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause."  Id. (internal quotation marks and citations omitted).  As for the NYSHRL, the plaintiff "need only show that retaliatory animus was a motivating factor, that is, that it played any role at all in the challenged conduct."  Edelman, 141 F.4th at 49 (internal quotation marks and citation omitted).

The parties agree that plaintiff engaged in protected activity when she filed her April 29, 2019 race/color and national origin discrimination complaint with NYSDHR for claims of failure to promote and unequal pay, and further agree that the instant action relates to solely this

protected activity and no other.  In addition, defendants concede that they were aware of plaintiff's protected activity.  Thus, at step one of the McDonnell Douglas analysis, only the third and fourth elements of plaintiff's *prima facie* case are at issue: whether plaintiff suffered a materially adverse action and whether there is a causal connection between plaintiff's protected activity and that materially adverse action.

Plaintiff points to a series of purportedly materially adverse actions and urges the Court to evaluate them individually and in the aggregate.  As set forth below, the Court finds that some of the actions were materially adverse while others were not.  Although it is true that "even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct," the Court finds that adding up the non-adverse actions in this case wouldn't do any good.  See Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568, 572 (2d Cir. 2011).  "'Zero plus zero is zero.'"  Id. at 572 (quoting MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 138 F.3d 33, 38 (2d Cir.1998)).

First are plaintiff's performance evaluations: (1) an August 20, 2019 annual evaluation which was overall satisfactory and contained a "needs improvement" notation in one area; (2) a February 25, 2020 six-month evaluation which was overall unsatisfactory and contained "satisfactory" notations in all but two areas; and (3) an August 31, 2020 annual evaluation which was overall unsatisfactory.  The Court finds that the August 20, 2019 annual evaluation was not materially adverse.  Plaintiff has not shown how a satisfactory evaluation noting one area of improvement is negative, as opposed to instructive or constructive, and has identified no adverse consequences from the evaluation.  The Court also finds that the February 25, 2020 six-month evaluation was not materially adverse, even though it was unsatisfactory, because it was an explicitly non-final review with no adverse consequences.  Arguably, the six-month evaluation

benefitted plaintiff, or theoretically could have, because it alerted plaintiff to her performance issues and told her what improvements she needed to make to avoid an unsatisfactory annual evaluation.

The Court does, however, find that the August 31, 2020 annual evaluation was a materially adverse action because it was an unsatisfactory evaluation with adverse consequences. Plaintiff explains that when an employee achieves five, ten, or fifteen years of good performance evaluations, the employee is entitled to a year-end performance award of $1,500, $3,000, or $4,500.  Because plaintiff received an unsatisfactory annual evaluation, she was unable to obtain a year-end performance award.  Further, plaintiff states that her unsatisfactory performance evaluation stays in her record and can interfere with promotions and favorable transfer opportunities.  Defendants do not contest any of these facts.

Next are the disciplinary actions: (1) the two DeCusatis interrogations, held on January 9, 2020 and March 9, 2020; (2) placement on administrative leave with pay on March 9, 2020; and (3) the Notice of Discipline on August 5, 2020.  The mere fact that these were disciplinary actions does not make them adverse actions, for the Second Circuit has held that "[a]n employer's 'enforcement of its preexisting disciplinary policies in a reasonable manner' does not amount to a materially adverse employment action."  Starzynski v. Stanley Black & Decker, Inc., No. 21-cv-3040 2022 WL 17825920, at *1 (2d Cir. Dec. 21, 2022) (cleaned up) (quoting Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 26 (2d Cir. 2014)).  However, a reasonable jury could conclude that these disciplinary actions, as applied, "represented a departure from [OMH]'s normal disciplinary practices, such that they might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  See Rivera, 743 F.3d at 26 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

17

DeCusatis interrogated plaintiff on a broad range of topics, including her work performance, without informing her of all the charges against her.  Plaintiff was immediately placed on administrative leave following her second interrogation and was escorted out of the office in front of all staff.  Months later, after she had already returned to work, plaintiff received a Notice of Discipline which threatened loss of two months' income and included a form for plaintiff to tender her resignation.  From these disciplinary actions, any reasonable employee might feel that her employer was searching for a reason to fire her or pressuring her to resign.  In turn, such actions could dissuade a reasonable employee from making or supporting a charge of discrimination.  Finally, a jury ultimately could find that defendants exceeded the scope of OMH's normal disciplinary practices.  Accordingly, for purposes of satisfying her *prima facie* case, plaintiff has shown that the interrogations, administrative leave, and Notice of Discipline were materially adverse actions.

Lastly, there are plaintiff's claims against Carlin and Close: that Carlin was taking photos of her during a meeting and that Close asked her whether she had security cameras at her home.  Even if these can be interpreted as threats (the Court is dubious), "empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions."  Vazquez v. Southside United Hous. Dev. Fund Corp., No. 06-cv-5997, 2009 WL 2596490, at *12 (E.D.N.Y. Aug. 21, 2009); see also Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP, 915 F. Supp. 2d 498, 508 (S.D.N.Y. 2013) (confrontation with supervisor regarding scheduling that plaintiff found "uncomfortable" and caused her to fear for her "physical safety" was not a materially adverse employment action absent any evidence that the supervisor was "prone to violence or had a history of violent confrontations").  Given that

18

neither Carlin nor Close ever acted on their purported threats, the Court finds that these threats were not materially adverse actions.

In summary, the cognizable adverse actions are, in chronological order: (1) the first DeCusatis interrogation, held on January 9, 2020; (2) the second DeCusatis interrogation, held on March 9, 2020; (3) placement on administrative leave with pay on March 9, 2020; (4) the August 5, 2020 Notice of Discipline; and (5) the August 31, 2020 unsatisfactory annual evaluation.

The Court must now determine whether plaintiff has established a causal connection between the April 29, 2019 NYSDHR complaint and any of the five adverse employment actions. "'[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus.'" Hicks, 593 F.3d at 170 (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff clearly cannot show indirect causation. She has made no showing that other employees engaged in similar conduct were treated differently. Further, she cannot rely on temporal proximity because the materially adverse actions were not sufficiently close-in-time to the NYSDHR complaint. "[W]hen a plaintiff relies on temporal proximity alone to establish causation, courts 'uniformly hold that the temporal proximity must be very close,' which usually means less than three or four months." Gehlaut v. New York City Dep't of Educ., No. 24-1741, 2025 WL 2586770, at *2 (2d Cir. Sept. 8, 2025) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)); see also Sealy v. State Univ. of New York at Stony Brook, 834 F. App'x 611, 614 (2d Cir. 2020) ("[A]dverse employment actions occurring approximately three months

after protected activity are too attenuated to give rise to an inference of retaliation."). The first-in-time adverse action, the January 9, 2020 interrogation, came nearly nine months after the NYSDHR complaint. Even construing the date of the interrogation as the date plaintiff first received notice of the interrogation (November 22, 2019), there is still a seven-month gap.

Plaintiff also cannot establish indirect causation by arguing that the adverse actions constitute a "pattern of antagonism." The adverse actions themselves do not reveal any retaliatory motive: there is no language in the annual evaluation, administrative leave, or Notice of Discipline documents referring to the content or fact of plaintiff's NYSDHR complaint, and no indication that DeCusatis questioned plaintiff on that topic during either interrogation. Further, the mere existence of multiple adverse actions does not prove causation except by circular reasoning.

Notwithstanding, at least for purposes of making her *prima facie* showing, plaintiff has shown causation through the following evidence: Carlin's September 19, 2019 email to Ragone wherein she mentioned plaintiff's NYSDHR complaint and said that the situation with plaintiff was "becoming untenable"; Carlin's February 26, 2020 email to Ragone, DeCusatis, and Close wherein she recommended another interrogation of plaintiff "quickly before [plaintiff] filed another grievance and/or complaint"; and the decline in plaintiff's performance evaluations beginning in August 2019, see Curcio v. Roosevelt Union Free Sch. Dist., No. 10-cv-5612, 2012 WL 3646935, at *15 (E.D.N.Y. Aug. 22, 2012). Because plaintiff has met her *prima facie* burden under § 1983, she has necessarily met her *prima facie* burden under the less stringent NYSHRL.

At step two of the McDonnell Douglas analysis, defendants are able to easily rebut plaintiff's *prima facie* case with evidence of legitimate, non-retaliatory reasons for the adverse

actions.  Plaintiff's unsatisfactory annual evaluation as of August 31, 2020 was the result of well-documented work performance issues.[9]  According to defendants and as set forth in the "Background" section of this opinion, supra, plaintiff did not submit reports in a timely manner, frequently did not follow the LIFO unscheduled absence call-in policy, and was adversarial towards supervisors and coworkers.  Defendants counseled plaintiff on all these issues but plaintiff did not improve.  Plaintiff's unsatisfactory evaluation appears to have not only been appropriate, but foreseeable – especially given that plaintiff was warned of the possibility at her six-month evaluation.

Additionally, defendants argue that the interrogations and administrative leave were part of the standard disciplinary process outlined in plaintiff's PEF Contract and stemmed from plaintiff's failure to provide necessary information for them to investigate her serious claims against Carlin and Close.  The Notice of Discipline that followed was a result of that same misconduct, plus plaintiff's persistent performance issues and non-compliance with LIFO policies.

Because defendants met their burden at step two and defeated the presumption of retaliation, plaintiff must, at step three, raise an issue of fact that retaliation was a substantial reason or "but-for" cause for the adverse employment actions.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845-46 (2d Cir. 2013).  Although the but-for cause standard does not apply to NYSHRL claims, see

---

[9] The evaluation, though unsatisfactory overall, actually appears to be rather even-handed.  Plaintiff received satisfactory notations in several areas, including complaint processing, which was an improvement from her six-month evaluation.

Edelman, 141 F.4th at 49, the Court need not address which standard applies because on this record, the distinction does not alter the Court's conclusions.

Plaintiff argues that she "did not have any performance issues; that the complaints lodged against her were fabricated or trivial complaints about exceedingly minor matters; that there simply [were] no time keeping violations whatsoever; and that the [d]efendants orchestrated the March 9 interrogation as a pretext to conjure up grounds to suspend and charge [her] with misconduct." The Court does not see how any of these conclusory and speculative allegations go beyond conspiracy theory.

Plaintiff's evidence of retaliatory animus may have been sufficient to meet her *de minimus* burden at the *prima facie* stage, but it does not withstand scrutiny when evaluated against defendants' legitimate reasons. The decline in plaintiff's performance evaluations is easily explained through plaintiff's well-documented performance and interpersonal issues upon returning to work from leave in April 2018 and December 2018.

As for the Carlin emails from September 19, 2019 and February 26, 2020, these are not the smoking guns that plaintiff claims them to be. The Court must view all facts in the light most favorable to plaintiff but it need not adopt her interpretations of the evidence which, in the case of these emails, are unsupported.

In her September 19, 2019 email to Ragone, Carlin did *not* say that plaintiff's "position at the office was 'untenable' because [plaintiff] had filed her charge of discrimination against Carlin and Close in April 2019." Carlin's email, quoted at length in the "Background" section of this opinion, supra, makes clear that the "situation" that had become "untenable" was supervisors' inability to work with or adequately supervise plaintiff out of "fear that she [would] make an allegation or complaint" against them in retribution. Carlin is clearly asking for

guidance, not recommending that they treat plaintiff adversely because of her complaints.  The email does not reveal any retaliatory motive unless we are to understand all of Carlin's claims to be completely fabricated.  Although that's what plaintiff would urge, the record does not support it.

In her February 26, 2020 email to Ragone, DeCusatis, and Close, Carlin did not direct Ragone and DeCusatis "to re-interrogate [plaintiff] because [plaintiff] told Close that his negative performance evaluation of her in February 2020 was retaliation."  Instead, Carlin said that she "would support scheduling another interrogation meeting" given plaintiff's "poor response" to her six-month evaluation.  It is true that Carlin mentioned that plaintiff "accused [Close] of 'retaliation' if another interrogation [was] scheduled" and therefore hoped that it could be "scheduled quickly" before plaintiff's next grievance or complaint.  However, it does not follow from Carlin's understandably sardonic tone that Carlin was seeking to retaliate against plaintiff for her NYSDHR complaint from ten months prior.  In fact, it's not clear that the NYSDHR complaint is even the complaint to which Carlin was referring: at the time of this email, plaintiff had lodged three additional complaints against her supervisors and colleagues.

Maybe plaintiff is right: maybe defendants were building a case against her.  But plaintiff cannot establish, in anything other than conclusory fashion, that defendants' reasons for doing so were retaliatory.  On the contrary, defendants have offered ample evidence demonstrating that they had legitimate, non-retaliatory reasons for their actions toward plaintiff, and plaintiff has not pointed to any weaknesses, implausibilities, inconsistencies, or contradictions in defendants' version of events that would undermine that showing.  See Canady v. Univ. of Rochester, 736 F. App'x 259, 262 (2d Cir. 2018).

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment is granted and the case is dismissed.

**SO ORDERED.**

_Brian M. Cogan_
_____
U.S.D.J.

Dated: Brooklyn, New York
      October 28, 2025